Mr. Duncan. Mr. Chief Justice, and may it please the Court, this case asks when a district attorney's office may be liable under Section 1983 for inadequately training prosecutors. Petitioner Orleans Parish District Attorney's Office was found liable for the terrible injuries  of Mr. Thompson by Brady violation on the theory the office was deliberately indifferent to Brady training, this despite the fact that there was proved no pattern of previous misconduct by office prosecutors. The district court exempted this case from the ordinary pattern requirement by making a flawed analogy to a hypothetical in this Court's City of Canton opinion. There, the Court suggested that a city may be liable, absent a pattern, if it fails to inform police officers of the basic constitutional standard for deadly force. Extending that hypothetical to this case was error. It misunderstood Canton's distinction between single incident and pattern liability, nullifying Canton's stringent standards of fault and causation. Ginsburg's something in between, because in Canton, the hypothetical was one rookie police officer. Here, it wasn't one rogue prosecutor. There were four prosecutors who knew of this blood evidence, and there were multiple opportunities for them to disclose it. But four of them apparently thought it was okay under Brady to keep this quiet. Now, if we were just talking about what was his name, Deegan, it would be a different case, but we have the three other prosecutors, and so I think it's questionable to characterize this as a single incident. I understand your question, Justice Ginsburg. Our argument does not turn on whether it was one or three or four prosecutors. What our argument does turn on is that the theory from the Canton hypothetical, which does not require a pattern, was clearly at issue in this case. The district court analogized to Canton in order to allow the jury to find liability absent a pattern. There is no question that whether it was one or four prosecutors, this is a single incident of a Brady prosecution. Sotomayor, a single incident. And Canton said, if you know that a tort is likely to happen without training, then one incident is enough. Every prosecutor knows that there can be Brady violations if people are not taught what Brady means, because it's not self-evident in every situation, correct? That's true, Justice Sotomayor. All right. So if you know that rookie prosecutors in most prosecutors' offices are filled with young ADAs who have just come out of law school, if you know that they are going to meet some situations where the answer is not intuitively known, like that if you get a lab report, you should turn it over, don't you have an obligation, isn't that what the jury said, to train them to turn over lab reports? Now, I know you claim you had that policy. We can talk later about whether or not there was sufficient evidence for the jury to disbelieve that you had that policy or not. That's a sufficiency of the evidence question. But if you know that lab reports have to be turned over, you've conceded it's a Brady violation not to do it, and there was sufficient and you had no policy, I know you're disputing that, and you had no policy of turning it over, why aren't you responsible for a Canton-like violation? The question is, under that, the Brady scenario, which side of the Canton line does it fall on? Does it fall on the single incident line or the pattern line? We say it falls on the pattern line. Ginsburg. But life doesn't always come in just two categories, and my suggestion to you is this doesn't fit into the single rookie. You have to have four prosecutors who are not turning over this evidence, then it seems like there's kind of a culture in the office that we don't turn over. Either we don't understand Brady, because one suggestion was, well, having the blood sample will show you, you'd have to have the blood sample from Thompson to have it mean anything. So there was misunderstanding about that, but what struck me was that the to shoehorn this into a single incident, it doesn't fit. So we have a situation maybe that hasn't, that we haven't directly confronted before. I think the Court has in Canton, Your Honor, and let me answer it this way. If we pay close attention to the function of the single incident hypothetical in Canton, I think it illuminates the kind of notice, the kind of fault and the kind of causation that needs to arise out of a general situation. So looking carefully, what Canton said is a policymaker fails to give police officers the basic constitutional standard for deadly force. They're not equipped to know in the beginning, and without which they can't. Ginsburg. Can you tell me, I think I have. I'm sorry, Your Honor. Yes. This is, this is, I'm referring to the basic Canton standard, is it 390, page 390 of the Canton opinion? And specifically the footnote is footnote 10, that discusses the two possibilities, the no pattern and the pattern possibilities. So, and I'm reading from footnote 10. City policymakers know, for example, the Court said, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part allowed them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be so obvious, the failure to do so is deliberate indifference. Now, what we have there, as Justice O'Connor's concurrence in that case, and then later the Court's opinion in Bryan County explained, you have a failure to inform city personnel of the basic standard without which they have no hope of doing their job in a constitutional manner. So you put your employees in a situation of impossibility, and when a deadly force violation occurs, what you have there is a situation where they have no hope of doing their job in a constitutional manner. Scalia. These are people who haven't gone to law school, right, and do not know that you cannot apply deadly force in most circumstances. They've got no background equipment to know what the constitutional standard is, and so that satisfies in a general situation. If you were giving guns to lawyers, it might have been different. It could be, Your Honor. Here, you're giving them. Depending on the law school they went to or what? It could be. However, what you're giving to lawyers here is the task of analyzing legal judgments. Can lawyers' judgments go astray, Justice Sotomayor? Absolutely. Absolutely.  Sotomayor, I think that a lawyer's judgment is going to go astray, because a particular area of law is that complicated. Your people disagreed, some of your people disagreed or didn't know whether turning over a lab report was a failure to turn over a lab report when you didn't know a defendant's blood type was a Brady violation. That's been conceded in this case. So I accept as a working proposition that they should have known that. What you're suggesting is you get a pass because even though you know that there's an area of law that a young lawyer is not going to be able to figure out on their own, you fail to train them and you're okay. That's not the Canton example. That is not the Canton example, Your Honor. That's what you're saying. No, that's not what we're saying. We're not saying that the policymaker inevitably knows my prosecutors are going to make this mistake and so I need to train on it. I don't care about it. Sotomayor, could we just clear something up? Are you accepting the proposition that Brady always requires that lab reports be turned over? No, Your Honor. What we concede in this case is that there was a Brady violation here. But in answer to some of the questions, it seemed to me you were possibly, at least  I'm not aware that it would always be a violation of Brady. However, of course, we have evidence in this case that the uncontradicted evidence, that the office policy was to turn over all scientific reports. But I think that's what we're saying. Mr. Duncan, could I give you a hypothetical just to test how strong your position is here? So let's say that there's a new DA comes to town and he says there's going to be one that will be a random assignment system, so sometimes important cases will be tried by experienced attorneys, but sometimes they'll be tried by people right out of law school. And there will be no Brady supervision at all, no Brady training. And there's a closed file system that we only turn over what we're required to turn over and not anything else. And in addition to that, if I, the DA, find that you have turned over things that you're not required to turn over, that will be taken into account in your yearly review for promotion purposes, for salary purposes, et cetera. That will be very severely frowned upon. So he, the new DA. Sorry, repeat that last part again, the severely frowned upon. If you turn over anything that you didn't have to. Exactly. I understand. If you give any material that you're not required to do by law. And so he puts into place this whole system and says, okay, go to it. And what happens is that there are Brady violations, and there's a Brady violation in a capital case and the person sits on death row or the person is executed, whichever, and there's a claim brought. Is that claim not a good claim? If there's a pattern of demonstrated Brady. It's not a pattern because he just came to town and he just, you know, instituted all these policies. And this is the first Brady violation. Not for the first Brady violation, Justice Kagan. But in your hypothetical, you noted a policy of actually assigning inexperienced prosecutors randomly to perhaps high-profile cases. If that were the facts, the jury, as they could have in this case, could have found that an official policy actually caused the violation, but they didn't find it in this case. So the hypo leaves open that possibility.  Kagan. If the failure to train or supervise in any way and the setting up a structural system that's pretty much guaranteed to produce Brady violations, that would not be enough. In other words, even if the jury said yes, you're liable under that second theory, not the policies theory, but the failure to train and supervise theory, that would have to be rejected. No, no, exactly, Your Honor. No liability there because it doesn't meet the stringent fault and causation standards of Canton. And this gets back to what I said. Breyer, but how is that so? The, the, I read the instruction that the court gave, and it seemed to me the instruction the court gave was word for word taken for Canton. And when I read the question that you presented in your Petitioner's brief, in the Petition for Cert, I thought what this case was about was an instance where there was only, it's conceded that there was only one such instance. But then when I read the, the, your second reiteration of the question, which is a little different, and read the, the briefs, I thought, no, there are four other ones. And so what you're really asking us to do is to decide, in the case of perfect instructions, whether the evidence supports them. I didn't think I was getting into that, and, and frankly, it embraces the brief. I think it clearly supports it, but others could disagree. But why are we getting into that business in this Court? We're not asking you to do that. Breyer, then what is it you're asking? Is there something in the instructions that's wrong? What? Yes, the instructions reflect that, that the single incident theory. We're sorry, we're, we're, I'm reading the instruction. Yes, Your Honor. I have it here. What is it? I'm not saying you're wrong. I'm just saying what in the words stated are wrong? And where is the request that they be stated differently, that, that I should look at that, and that they weren't? Yes, Justice Breyer, let, let me help you with that. The, the, at, at the Joint Appendix, page 828, we have the instructions on deliberate indifference. I'm sorry, what's the page number? 828. 828. Joint Appendix 828. I think I'm right about that. There are the instructions on deliberate indifference. Let, let me start here, Justice Breyer. These instructions are taken from the Second Circuit's Walker decision, which was the first court that I'm aware of to allow for the possibility of single incident liability in a Brady situation. The second instruction there allows a choice. It allows a choice for the jury to find that a single incident situation, I'm sorry, that a situation involving a Brady decision could arise and, and be a basis for. What are the words? I mean, look to me like the words on page 828 are pretty similar to my copy of what he actually said. So, so what are the words on page 828 that you think he should have said that he didn't say? The situation involved a difficult choice or one that prosecutors had a history of mishandling. What he says here is the situation involved a difficult choice or one that the prosecutors had a history of mishandling, such that additional training, supervision, or monitoring was clearly needed. So it looks to me like, unless I'm reading the wrong page, which I've sometimes done out of my memo here, it looks to me like he gave those words. That is the instruction. I'm sorry. I misunderstood your question. Those are the actual instructions. Breyer. I'm saying what is it that you ask the judge to do that he didn't do, or that you ask him not to do that he did do? That's what happens. That's the way you object to an instruction. I understand. Okay. So what is that? I misunderstood. I was reading where I thought the single incident theory was posed in the jury instructions. What the Petitioner specifically asked. I thought he asked that, so I was glad to see that. Thank you. The Petitioner specifically asked that an instruction be given that required a pattern of similar practice. Well, I want you to point out in the record the words that were said to the district court saying, judge, I want you to say this, and then the judge didn't do it. It is instruction number 14. Which is where? The proposed instruction. I regret to say I don't believe that's in the joint appendix, Your Honor. And it is also. And I think we take it as saying that you are not objecting to what the instruction. No, Your Honor. I mean, your whole brief is objecting to the instruction and you didn't include the objection? No, Your Honor. The argument is not about the specific jury instruction. It's about the legal theory. What it's about is. Wait, wait. If you don't object to the instruction, then we're back to what I'm saying, that what you're objecting to is you don't think the evidence was such that given that instruction, the jury could find guilt. And that's what I thought this case wasn't about to begin with, and there are three other instances, so I don't see why, given this instruction, the jury couldn't find guilt. What our main complaint is, is about the failure of the district court to grant a motion for summary judgment and a judgment as a matter of law on the basis that a failure-to-train theory under these circumstances does not permit the single incident. Sotomayor, I understood, and maybe I'm confused, that you were arguing that there was no set of circumstances in which a prosecutor could be handled, could be liable on a theory of failure-to-train for one incident. That was the petition. Correct. Correct. So it doesn't matter what the facts are. The facts that Justice Kagan gave you would never constitute an actionable claim against the prosecutor. Is that your position in this case? That's correct. Under the Canton hypothetical, yes, it would have to fall on the Pattern side because the general Brady situation is unlike the single incident. So what you are saying is that the district attorney said, you know, every day he came into the office and he said, I think Brady's just crazy, and I think that's just the worst decision that the Supreme Court has ever issued, and as long as you don't get caught, anything you do is okay by me. That sounds like a policy to me, Your Honor. That sounds like a policy, an actionable policy on the part of the policy. It's not a policy. He's just, you know, making his views known around the office. Well, this Court has defined policy as the deliberate choice to embark on a course of action in Pembauer, which this Court accepted. That sounds like a policy to me, if it's not a policy. The policy is just that you have to turn over what you have to turn over, nothing else, and if you turn over anything else, you'll get penalized for doing so. That's the policy. Well, then the policy is constitutional. So what we would look to is, are prosecutors failing to exercise their judgment properly pursuant to that policy? And that falls very squarely within the second part of the Canton choices, which requires a pattern. This case is about the alleged failure to remedy, to guide, to reinforce the preexisting legal judgment that a prosecutor has by virtue of being a legal professional. Is that so? I mean, you are assuming that everyone who goes to law school takes a course in criminal procedure, and I think there are many law schools where they don't even have such a course, and others where most, I don't know, anywhere it's compulsory to take a course in criminal procedure. So you're assuming that. And because time is running, there's something I wanted to ask you about, Brady, which seems to me unlike others, and why you would want special vigilance. And that is, Miranda warnings, you know what was said. Search and seizure, you know what the police did. But the problem with Brady, and this case illustrates it so well, is you don't know. If the prosecutors don't do what they're supposed to do, there's a very high risk, as there was in this case. It will never come to light. So recognizing the legal obligation of the prosecutor and the temptation not to come out with Brady evidence, because it doesn't help the State's case, shouldn't there be extra vigilance when we're talking about a Brady claim? Well, of course there should be vigilance. But the question you pose, Justice Ginsburg, is whether the latency, the hiddenness that characterizes Brady violations should change where we locate the Canton violation. Should it be enough to put it into the single incident, so obvious category, we're still in the pattern category. But Canton doesn't indicate that the latency of a particular violation should turn on which category it goes into. Instead, it's the nature of the employee duties and the employees themselves, and how that situation gives notice to a policymaker about when there are obvious training risks. That's what we're talking about. So to go back to the hypothetical in Canton, whether or not a deadly force situation is secret or not, of course it's not. But the office has failed not just to train, but to inform of the basic constitutional duty without which those officers have no chance of fulfilling their duties. And when they do a deadly force violation under those circumstances, the causal link will be very strong. It will be strong enough to meet Canton. And so there you have a situation where deliberate indifference and causation are met without the pattern. But what you do not have that in the situation of Brady compliance, because as everyone agrees, Brady involves gray areas. It is impossible to determine beforehand exactly why a Brady violation will occur and what specific training measures would prevent it from occurring. And what that means is this falls plainly within what Canton said about the pattern situation. Here's what Canton said in the footnote 10, following on to the hypothetical. It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious. That's the situation we have posed by the Brady situation in general. Breyer. But I mean, look, let's – I – he read the instructions. They came right out of Canton. It seems perfect. Now, you're saying, well, whether they did or not, you cannot have an incident – you can't have liability if there's only one incident. And at that point, I say, gee, I don't know. I mean, maybe it depends on what the incident is. Maybe the incident involved somebody saying, hey, Brady, what's Brady? Or somebody saying, what's a criminal trial? I mean, that person needs training. And – or I don't even – but I don't even have to think of that here, because there were four incidents here. And therefore, I don't have to try to make up weird hypotheticals. So where we have four instances and we have correct instructions, what's the problem? Your Honor, there weren't four instances. There was one Brady violation that possibly could have involved one to four prosecutors. That's one. Okay. Okay. We have – we have all this case? I thought that they had several instances in other cases. No, Your Honor. All involved – in other words, there's never in this office been an instance of a Brady violation outside of this case. No, Your Honor. That's not the case. Not before this case. There were some later cases. That's what it was. There were some – there were four reported Brady violations before this case in the decade leading up involving this office. It had nothing to do with the circumstances involved here. Ah, there were four Brady violations involving this office, okay? Correct. Out of tens of thousands of prosecutions. All right. So now we're talking about not one, we're talking about four. Over many years with tens of thousands of violations, correct. What was it? The Fifth Circuit panel in this case affirmatively said Thompson did not even try to prove a pattern and did not prove a pattern of violations. The Fifth Circuit panel said that. This is helpful. Thank you. Thank you. On your instruction at JA 28-2, would the instruction in your view have been proper if the or had been replaced by an and? So the situation involved a difficult choice and one that prosecutors had a history of misunderstanding. That's closer to what it should be, Justice Kennedy, yes, because that begins to capture the pattern requirement. It's not the pattern instruction that was specifically put forth by the Petitioners in Instruction No. 15. Has there been any argument that you have waived your objection to the instructions? Not by Petitioners and not by the Respondent in this case. There's no particular question. Did you object to it, to this charge? The charge? With the or, difficult choice or one that the prosecutors had a history of mishandling? No. The Petitioners did not object to the specific formulation of that charge. Immediately after that charge, though, they said, no, but we have to have a pattern instruction here. In other words. In other words, the pattern instruction was rejected. It was rejected. It was rejected twice, Your Honor, first in the formal jury instructions and then at the charge colloquy. But that wasn't the question presented to us. You didn't present to us an issue of whether the jury instruction was wrong or not. No, Your Honor. What we present is the legal theory on which this case was submitted, was what got to the jury in the first place. It never should have got to that legal theory. See, what I'm trying to figure out is whether your position is that under no circumstance, even the hypothetical that Justice Kagan set forth, could you be charged with a single incident Canton violation. That is your clear position. With respect to the Brady situation, Your Honor. To the Brady situation. Let me answer it this way. What the Canton single incident hypo is talking about is failing to provide employees with basic tools without which they absolutely have no chance of fulfilling their constitutional obligations. It's difficult to imagine that situation for prosecutors. It's conceivable that a district attorney's office sets up a structure where prosecutors have no chance of even knowing whether there's Brady evidence in the file. If you have that situation, then it's closer to the Canton single incident hypothetical. But not involving the exercise of legal judgment in particular cases, we say no. Sotomayor, but how do you exercise legal judgment if you don't even know what you're supposed to turn over? That was just an instance question. That's my point. That's my point. If you don't, if you don't even, in other words, if you don't even have the police file, for instance, you can't exercise your legal judgment if you don't even know what the subject of your legal, the object of your legal judgment is. But that's not this case. What we're talking about here is a failure to remedy, reinforce, refine existing legal judgment that prosecutors have. Thank you, counsel. Roberts. Thank you. Mr. Cooney. Mr. Chief Justice, and may it please the Court. Although the Petitioner's brief attempts to relitigate factual issues that were resolved against them by the jury, they have raised today only one question of law, and that is whether this Court should write into Section 1983 a per se rule that the only way, the only way a civil rights victim can ever establish the deliberate indifference of a district attorney is if he can prove a prior significant history of assistant prosecutors violating other citizens' constitutional rights. For Brady violations. They limit the principle to Brady violations. Yes, Your Honor. And I would submit that's a significant limitation, don't you think? But I would submit, Your Honor, that this Court's, that their requirement for proving deliberate indifference is, first, contrary to the teaching of this Court in Canton and subsequent cases. It finds no place in the language of Section 1983. But at the outset, it seemed to me, and correct me if I'm wrong, that you misstate the theory on which you seek to have a reversal, and that this is a failure-to-train case. You didn't mention that. Your Honor. It is a failure-to-train case. It is absolutely a deliberate indifference to the need to train and provide other protection in the office. Well, I think that's very important. If you could, could you just say as succinctly as possible what you would tell assistant district attorneys, if you were the district attorney for this jurisdiction and you, with the benefit of hindsight, having seen this case, what kind of, what would you tell them they should do with respect to Brady? Yes, Your Honor. First of all, I think Canton says you have to look at the specific circumstances. And so I don't think there's one size fits all way or message that has to be provided. No, but you're training them. So now I want to tell you what you have to do under Brady. What do you tell them? In this office, Your Honor, I think the first thing one has to confront is Mr. Connick's testimony and, in fact, the concession that the Petitioners made on pages 6 and 7 of their merits brief, that the office started with what the brief described as Connick's disclosure policies were no mystery. Turn over what the law required and nothing more. Justice Alito's question was what you would tell the assistant DAs. What's your answer? Mr. Chief Justice, with the – first of all, I wouldn't start with that rule. But if I started with that rule, it would be incumbent upon the DA. Why wouldn't you start with that rule? The rule is perfectly lawful, my goodness. Your Honor, I'm not saying it's an unlawful rule. However, it requires a countervailing message. And if you're going to adopt. I really would appreciate it if you'd get to my question. Brady requires that exculpatory evidence be turned over. Now, do you think these – the assistant prosecutors didn't even know that? Your Honor, I don't know that. It seems from the record in this case they thought that only something that screamed exculpatory evidence on its face needed to be turned over. Okay. Now, you phrase – you're the instructor. You phrase the lesson that you think is required by Brady that has to be given to them. I think at a minimum it has two pieces, Your Honor. It has basic instruction about how to go about fulfilling the Brady obligation and how do you go about looking through the file to make sure you know what's there, making sure you have documents that are in the possession of the police, thinking in advance, as this Court talked about in the Aggers case, about what the evidence was favorable to the accused and needs to be produced. Okay. That's your instruction on Brady. Now, you're basing liability on this incident of failing to comply with Brady. So you say they should have instructed on Brady. What else should they have instructed on? Well, Your Honor. You're the new DA and you're putting up, I need to instruct my people. What do they instruct on? We know they instruct on Brady under your view.  I think the second thing that the office really should do is to say, well, we're going to protect the innocent.  And the reason we're doing that is to talk about the importance of safeguarding the innocent here, that our job is not just to secure convictions. Well, you're looking at we're looking at specifics where they're going to violate the Constitution. I think that's a good thing, to tell them they have an obligation as well to protect the innocent. But we're worried about violations of our constitutional requirements. We know Brady is one. What's the next one? We're worried about violations of our constitutional requirements. We're worried about violations of our constitutional requirements. We're worried about violations of our constitutional requirements. Most of the hypotheticals, however, that have been brought before the Court as a parade of horribles aren't actions by the district attorney. I mean, with respect, I really don't think that as a young district assistant district attorney that you've told me anything that's going to be really helpful to me, other than, you know, follow the law, which you certainly should do, in dealing with my obligation to turn over physical evidence, which is what's involved here. Sotomayor, Your Honor, I think you're right. Or a lab report regarding physical evidence. Now, suppose I have several cases. I have this case where I've got a blood – I have physical evidence and I have a blood test. I have another case where all I have is physical evidence, but there's been no testing of it. Now, do I have to turn over that physical evidence? In this case, there's been a stipulation by the district attorney's office that you do. And I think if you think about the evidence. I have to turn over all physical evidence that's in my possession? No, Your Honor. But here, the specific. What's the instruction that you're going to give me to tell me where I'm going to draw that line? If you have physical evidence that, if tested, can establish the innocence of the person who's charged, you have to turn it over. Well, how do I know that before the case? How do I know that before the physical evidence is tested? Suppose I've got all sorts of items that were found at the scene, and they might have DNA on them, they might have epithelial samples on them, you know, all this fancy forensic testing that's done these days. Do I have to turn over all of that? No, Your Honor. In this case, what we're talking about is a piece of evidence, a specific piece, several specific pieces of physical evidence that it's been stipulated. The prosecutors knew contained the blood of the perpetrator. The rule and the training that should have been provided in this instance, particularly since the DA argues that it was perfectly clear that that should have been produced. See, what I'm getting at is that you're dealing with a very specific situation. So the instruction would be, if you have physical evidence and you've tested it for a blood, and you have a you have the result of a blood test, but you don't know whether you don't know the blood type of the accused, that's Brady evidence, and that has to be turned over. And you're saying that the failure to provide training to every assistant district attorney on a question of that specificity gives rise to a potential claim. You're asking for a claim. What I'm saying is I think there are at least three layers to the training that we're missing here. One was the clear message about the importance of Brady compliance. The second was the basic ground rules about how you go about your Brady obligation. And third, if you have evidence that can conclusively establish to a scientific certainty the innocence of the person being charged, you have to turn it over or get it tested. You can't just put it in your hip pocket and say, I know. Sotomayor, what evidence is there that they put this in their hip pocket? There was a disclosure that the evidence existed. Where is the evidence that the defense counsel didn't have access to asking for it? Waxman, or asking for it to be tested? Where was that suppressed? The only information, there was a discovery response that was filed very shortly before trial, long after Mr. Thompson was charged with the crime, where in response to one of the questions, the response was inspection to be permitted. If you look at the chronology. Sotomayor, where is the Brady violation for telling a defense attorney there was a blood sample there, you can test it? Your Honor, there was no information provided. It was the simple response was, the request was for all scientific evidence and it's simply and physical evidence from the scene of the crime. The answer was inspection to be permitted. Then the blood evidence, the very next day after the response was provided, was removed from the crime lab by the prosecutors, never to be found again, and defense counsel testified without impeachment at trial that he went to the evidence locker, looked in the evidence locker, found certain pieces of physical evidence consistent with the discovery response, but not the blood evidence, neither the blood report nor the physical specimens that were involved in this case, Your Honor. So that you are claiming there was suppression of that evidence? Absolutely, Your Honor. So if it is prosecutors can violate a defendant's constitutional rights by making improper statements in their closing arguments, do you have to instruct new – I suspect new prosecutors coming out of law school don't know what those rules are. Do you have to give instruction on what they can say in closing arguments? Your Honor, I think, first of all, the issue has to rise to a constitutional level in order to be talking about this at a first section of the statute. My understanding is, but I don't – I'm not an expert in criminal law. I need training in that. But my understanding is that comments in a closing argument can give rise to a constitutional violation. So you should train those people. You know that. You know that that can happen, just as you know there can be Brady violations. So they need training in exactly what they can say and can't say in closing arguments. I would just say that I would – And Miranda and proper supervision of affidavits in support of search warrants and proper instructions to tell the police not to exceed the scope of the warrant. So this is – our course is expanding. Justice Kennedy. The point of concern here is that we're going to have to go through a list, case by case, of everything there has to be training on. I think there are some important distinctions here.  You're talking about Miranda, you're talking about those things. The actor that's committing the constitutional tort there is not the district attorney. It's the police. What we're talking about here, the constitutional tort. When you're talking about improper comments in closing argument, it is the prosecuting attorney. The second important distinction, Your Honor, and I do believe training should be given there, but I think there's a fundamental distinction between a Brady violation, which happens in private and may never be revealed, and if revealed, often happens long after trial and long after incarceration, and a situation where a prosecutor makes an improper comment during a closing jury, which is made in public, defense counsel has the opportunity right there to stand up and say, Your Honor, I object, and the court has the ability to address that issue then and there. With a Brady violation, you don't have any of that. It's made in secret. Roberts. So you don't have to train with respect to closing arguments? Your Honor, I think they do. But I think there's a particular issue, there's particular force in this context because of the unique nature of Brady, because it's made in private, because it is, by definition, if the information has been concealed, it has not been revealed prior to the time the defendant suffers constitutional harm. He's found guilty, he's sentenced to death, et cetera. The Brady violation, unlike your situation, Mr. Chief Justice, doesn't come to light publicly, perhaps ever, but in Mr. Thompson's case, more than a decade after he was convicted. Ginsburg. It's something like what I was trying to get at before when I said Miranda is out there, you know what was said, you know what was seized, talking about the ---- but Brady is the prosecutor that doesn't come out with it, high risk it will never come out. So we have use of force, of course, that can kill people if they're not properly trained. Brady, because if they don't come up with the information, we could have what almost happened in this case. Anything else on this special list? The concern was that you don't want to have to give the prosecutors a clinical law school course before you let them do their job. I agree with that concern, Your Honor. And I think it's important to remember that in this case, this was a no training case. The evidence in the light most favorable to Mr. Thompson was there was zero Brady training in the office. So what would have been enough? I mean, is an hour a year enough? Is an hour a month enough? I think that would have been, depending on what its content was, Your Honor, and the other circumstances of the office. If you look at Canton, what Canton does is it asks the question, is there an obvious need for training based on the circumstances of this particular case? Scalia, as I understand it, you really had a need to train them when you know defense counsel is coming over to look at the physical evidence. Don't remove from the locker some of the physical evidence. You want to give a course in that? Your Honor, what happened is the physical evidence, very conveniently, was being sent to the crime lab when it was removed. And so we don't know what the motivation was as to why that physical evidence was removed at that time. What we know is for many, many months. Scalia, you shouldn't have mentioned it. I thought you were asserting that it was intentionally removed in order to prevent defense counsel from seeing it. What we assert, Your Honor, it was certainly not, it was intentionally not placed back in, into evidence after it came back from the crime lab, and there was actual testimony from the grand jury that was handling this and looking into this situation for some period of time about just that. There is a causation problem here of even assuming training, if Deegan was going to destroy the evidence or remove it anyway, as he admitted later to Rileman, then the training or lack of training is just irrelevant. Your Honor, I think there are. Kennedy, I'm very concerned about that causation aspect. First of all, and let me address that directly. First of all, the causation question was put to the jury. The jury instruction very clearly said, in order for there to be liability here, the fault must be in the training program, not in the individual prosecutor. And the defense argued vehemently that there was a lack of causation. What's interesting here is. The judge actually, though, instructed the jury, this is back on J.A. 828, in order to find that the district attorney's failure to adequately train, monitor, or supervise a manner to deliver it, deliberate indifference, et cetera. So liability could have been predicated not on the lack of adequate training, but the absence of a process by which superiors in the district attorney's office reviewed all of the Brady decisions that were made by more junior prosecutors. Isn't that correct? Your Honor, the concept of monitoring or supervision was actually a concept that the defendants injected into the case. And so to the extent that there's any concern that there's an expansion from training, it's been error that's invited. And I don't believe it's error, Your Honor, but it's not something that was put into the case by the defense or the court. Isn't this right? Why wouldn't that be error, that the head of a very large office is personally liable under Canton for violations that are produced by actions taken by subordinates unless there is an elaborate process to review all of the decisions that are made by those subordinates? Doesn't that go well beyond anything Canton permits? Your Honor, again, the clear thrust of this case was a failure to train case. The concept of monitoring and supervision was introduced by the defense, not by the plaintiffs. But to get back to Justice Kennedy's case. Sotomayor, could you please state in simple terms to me what exactly they failed to train these prosecutors to do that the prosecutors didn't do? What training, Justice Alito asked it generally, I'm asking specifically, what is the exact training that was required in this situation that caused the violation in this case? Number one, there was absolutely no Brady training at all. Forget about no Brady training. What — I think Justice Alito asked this question. What specifically would the training have said or done that would have avoided this Brady violation? First of all, I think a broad statement in training about the importance of safeguarding the rights of these prosecutors. Now, that seems to suggest that you're claiming that if there was an intentional violation by the prosecutors, that that statement would have avoided the prosecutor from doing something he or she knew was illegal. Is that what you're intending? No. No, it isn't, Your Honor. The second aspect of it, though, was what I said to Justice Alito, and that is, that if you have physical evidence which, if tested, would establish either the guilt or the innocence of the defendant, it needs to be produced or at least tested. That goes to the sufficiency of whether they had a policy to turn over or — because it was tested. So there was no Brady violation from the failure to test here. You know, I think that's the case. The Brady violation was for failure to produce. You're right. Well, isn't — am I right on this here? I read on page 4 of your brief that it seemed what happened — and I might not be right. Correct me if I'm not. What happened is a piece of paper called the Lab Report came to the — one of the prosecutors' attention two days before the trial. And what it said was the blood that was the perpetrator's was type B, and the person on trial has blood of type O. Is that what happened? Your Honor, certainly what the Crime Lab Report said was that the blood that was tested of the perpetrator was type B. And the prosecutor knew that the person on trial had type O. We don't know that, Your Honor. That's what we don't know. That's the unresolved factual question, and I think that's where causation comes in, Your Honor, because I think there are two possibilities. Did it turn out at the trial that eventually the prosecutor knew it was type O? It turned out that Mr. Thompson was, in fact, type O, but the evidence is unclear as to whether or not the assistants knew at the time that John Thompson had type O blood. Could I ask you what — in most law offices with which I'm familiar, the training is mentoring. In other words, the young attorneys learn from the older attorneys, often by following them along, around. Would it have been an adequate training program for this office simply to say, new prosecutors, you don't get to be first chair prosecutors until after a year, and you're going to follow one of the prosecutors around and learn from them? Is that an adequate training program? If, in fact, the senior prosecutors, Your Honor, have a good familiarity with the constitutional requirements, absolutely. Roberts Even if the violation that becomes the basis for a claim later on is one that, you know, didn't come up in that year. They didn't have a Brady issue in that first year. They went around, they sat in on a lot of trials, but there wasn't a Brady issue, and so they didn't learn about this type of question. And does that give rise to a claim of the sort you're bringing here? I think the failure here, and I think we have to come back to the deliberate indifference piece, because what would happen there in that instance, Your Honor, even if the training was not provided, I think, as experience has shown under Canton, that claim would fail for failure to show the deliberate indifference of the policymaker. But here you had substantial evidence about Mr. Connick's indifference. Alito Mr. Cooney, when you gave the specific instruction that you think should be provided to assistant district attorneys, what you stated was a questionable understanding of Brady, I think. You — did I understand you correctly? You said that Brady means that if the prosecutor has physical evidence which, if tested, might establish the defendant's innocence, that is exculpatory evidence that must be turned over. Your Honor, that's certainly been the position taken by the district attorney's office in this case. Is that consistent with Arizona v. Youngblood? Your Honor, I believe it is consistent with Brady that if one has a piece of evidence that can conclusively establish that the defendant is innocent, that it can't be the law that the prosecutor can just put it in his hip pocket, not get it tested, and not turn it over to the defense, and not worry about whether they're prosecuting an innocent man. Sotomayor, you see, it was tested, and it was made available to the defense. Turning over — using the word turning over is ridiculous, because they're not going to physically give it to the defense attorney to go off and do what he wants. They're going to give it to a lab that will establish a chain of custody, et cetera, et cetera. So it was made available. He went to look at it, but the looking at it wouldn't have told the defense attorney anything. They had to make it available for testing. He never asked for testing. They did the lab report. So now we come down to the only failure is in the turning over of this report. Correct? No, Your Honor. First of all, there is a stipulation, Stipulation L at JA14. Prior to the armed robbery trial, Mr. Thompson and his attorneys were not advised of the existence of the blood evidence, that the evidence had been tested, that a blood type was determined to be innocent. Sotomayor, what did I just say? The failure to turn over the report, correct? Yes, Your Honor, but what also is present here is the defense never had the chance to — never saw the physical blood evidence itself. Never knew it existed? Never knew it existed, Your Honor. And there is testimony, clear testimony to that effect. If you look at Mr. Williams's testimony in this case, there is a section of the cross examination where John Thompson's defense counsel at the original criminal trial said just that. He didn't know it existed. But it isn't clear from what — according to what you said earlier, it isn't clear that it was intentionally withheld from the defense. It might have just been — you said it was sent to the lab when he came to look for it? But — but — So would training have gone into that detail? Don't send something to the lab when defense counsel is coming over to look for it. I mean, you know, that's pretty detailed. Yes, Justice Scalia, but here there is a stipulation that a crime lab report with the conclusive evidence about the perpetrator's blood type was never ever provided. Okay. But that's the lab report. That's what Justice — And the physical evidence was never seen, Your Honor, by defense counsel. For all we know, by accident, right? And the training would probably not have remedied that difficulty. Your Honor, four prosecutors, it is clear that four prosecutors knew about the existence of blood evidence for months, and it was never produced to the defense. And that blood evidence would have conclusively established John Thompson's innocence. The defense was told to come over and look for it, to look at it. And when he came over to look at it, for all we know, by accident, it was — it had been sent to the lab. But, Your Honor, the it was not come over and see the blood evidence. It was — there was a broad request for physical evidence at the crime scene, including things that have nothing to do with blood. So there is nothing that the defense lawyer would have known by going to the evidence room to say, I know, there is nothing here. Roberts But isn't that — isn't that best practice? In other words, I thought that was the good thing, when what the prosecutor does is say, and look at everything we've got. And it — as my brother has suggested, what is important may not be there for either deliberate misconduct or by — by happenstance. Verrilli, But the point here, Your Honor, and I think this goes to the causation point, that — that it would appear, it would appear from looking at Mr. Williams' testimony, that there was a deliberate effort to stay away from blood evidence in the carjacking case. And Mr. — Mr. Williams conceded that. So this idea that this was an innocent error on the part of the prosecutors does not find support in the record. The question is whether there was an— Sotomayor But that dooms your case. If it wasn't an innocent error, if it was an intentional violation of Brady, there is no training that was going to stop him from doing that. Verrilli, Your Honor, I think there is a difference between a tactical choice to do something sharp on the one hand and a knowing Brady violation on the other hand. And the jury could clearly conclude, particularly because the 30b6 witness in this office testified that, in his view, it wasn't Brady material unless the — unless the prosecutors knew John Thompson's blood type, the jury could clearly conclude that what happened here was these four prosecutors didn't understand and never got a clear message about what Brady required, and they did not produce this evidence. There is nothing that clearly showed that they committed knowing Brady violations in this case. Kagan Mr. Cooney, I'm still confused as to sort of how much is enough by way of training and how you would ask a court or a jury to decide that. You suggested to the Chief Justice formal training wasn't — isn't necessary if there is some supervision, if there is some mentoring. But, you know, this seems to give cities no sense of what they have to do, no safe harbors. Is that your position? Verrilli, Your Honor, I think that Canton articulates a very flexible test. And I don't think Canton says there is one size that fits all. And I think the protection that district attorneys' offices get under Canton is from this standard of deliberate indifference. And if one looks at the 21 years of experience under Canton, there have been between 6 and 8 cases against prosecutors' offices under this kind of theory in total where there was some payout from the prosecutors' offices to the defense, total, in the 21 years. So — and the Court said, this Court said in Canton, judge and jury doing their job are adequate to the test. I think we've been spending a lot of time focusing on how much training. The fact is, this is a no training case where evidence that the defendants now concede should have been produced wasn't produced, and four people knew about it and failed to produce it. In addition, there were multiple additional pieces of Brady material in the murder case that weren't produced. Roberts. Roberts. Would this have been — would this be a no training case if the rule was you have to be in the office for 3 years as a second chair prosecutor before we let you have a case, and you have to be here 10 years before we let you have a capital case? That's all it says. Is that sufficient training? I think, again, you would have to look at the circumstances of the office. I think with this presumption against disclosure that was present in Connick's office, that takes this case out of the realm of the typical prosecutor's case because of this bare minimum disclosure rule. I think there needs to be, if you're going to have that bare minimum disclosure rule, there needs to be something to counterbalance it. What — if you look at what the assistants testified to in this case, they all knew what not to produce. What they didn't know was what to produce. But what do you do with the Duvalier testimony? Didn't he testify that it was standard operating procedure to turn over all lab reports? Your Honor, I think there are two very quick answers to that. If one looks at JA 550 to 551, which is Mr. Glass, the grand jury prosecutor's testimony, what he clearly said was during the grand jury when Mr. Connick decided to terminate the grand jury, Mr. Connick and his first assistant were actually arguing with Glass that if the prosecutors didn't know John Thompson's blood type, they didn't need to turn over the blood report. So that's number one. I think there is an issue of fact that has to be resolved in our favor solely from JA 550 and 551. And then the second is, Your Honor, the rule, the bare minimum discovery rule. Louisiana law did not require the production of crime lab reports in 1985. Roberts. Thank you, counsel. Mr. Duncan, you have three minutes remaining. Justice Alito and Justice Kagan, you asked repeatedly questions. I'm going to ask you a question that is designed to elicit the response from my colleague, what would you tell ADAs with respect to training, and I believe Justice Sotomayor as well, that would have prevented such a thing, and I didn't hear a clear answer. The legal issue in this case turns on the fact that in the deadly force scenario that Canton marks out as the paradigm single incident case, it is very clear what a police office needs to tell a police officer. Here is the deadly force standard under Tennessee v. Garner. Don't shoot people unless there is a reasonable probability of physical danger to yourself or others. You've got to tell them that. With respect to the Brady scenario, it's not clear at all. Yes, of course, training is useful. Yes, of course, training is important. But how do you connect up a lack of specific training with a particular violation that occurs? And having heard the argument, I'm no longer clear as to what the theory of the case of my colleagues is about what caused the violation. Whatever caused the violation, I haven't heard about a specific training measure that would have actually prevented what happened in this case. How do you train your new hires? First day, somebody right out of law school shows up and says, I want to be an assistant district attorney. How do you train them? I think the first thing you do is you have a hiring process that emphasizes the importance of Brady, as this office did. Brady was important. One witness said, McElroy, from the moment you walked in the door, you had to write an essay on Brady. Brady was emphasized as being very important. And then you got to say, I want to be an assistant district attorney. Kagan. Mr. Duncan, that I think you can't say, because that's just overturning what the jury found. I don't think the jury couldn't have found that that didn't occur, Your Honor. The jury found that that was inadequate. The jury found that there was inadequate training. Correct, Your Honor. In fact, the jury found, I think if you look at the record, the jury could have found, a reasonable jury could have found, that there was no training here. A reasonable jury could have found, well, Your Honor, we don't contest the finding of inadequate training. What we contest is the ingredients that lead, that can lead to a deliberate indifference finding on the basis of inadequate training. And what we say is that this case, that is a general case about you failed to train on Brady, it doesn't fit within the single incident hypothetical. And what I was trying to get at with response to your questions and Justice Alito's question was that if you can't say with any specificity, well, what training do you give? You asked repeatedly, Your Honor, how much training is enough. So is an hour a year. I thought I heard my colleague say that an hour a year may make this not a no training case, and so what you have there is a pattern of questions. Breyer. No, Your Honor, absolutely not. We don't, because they found that the failure to adequately train amounted to deliberate indifference to the fact that inaction would obviously result in a constitutional violation. That's what they found. Now, how can we, assuming that's true, and accepting it and not overturning it, find that there was something unlawful? Because you're arguing, you're all arguing about whether the training program really was adequate or not. They found it was not. What do we do? You correct me? Thank you, Your Honor. Mr. Chief Justice, the correct resolution is the lower court should have dismissed the failure to train claim as a matter of law because there was no demonstration of a pattern of violations, and this situation does not fall within the narrow range of circumstances that Canton foresees for single incident liability. Thank you, counsel. The case is submitted. The honorable court is now adjourned until Tuesday, the 12th of October at 10 o'clock.